1                IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                         WACO DIVISION

3  TRUSUN TECHNOLOGIES, LLC, ET AL    August 25, 2021
                                  *
4  VS.                             *   CIVIL ACTION NO.
                                  *
5  EATON CORPORATION, ET AL        *    W-19-CV-656

6            BEFORE THE HONORABLE ALAN D ALBRIGHT
                 DISCOVERY HEARING (via Zoom)
7
   APPEARANCES:
8
   For the Plaintiff:      Gilbert Andrew Greene, Esq.
9                          William Andrew Liddell, Esq.
                           Pierre Jean Hubert, Esq.
10                         Duane Morris LLP
                           900 S. Capital of Texas Hwy, Suite 300
11                         Austin, TX 78746

12 For the Defendant:      M. Craig Tyler, Esq.
                           Perkins Coie LLP
13                         500 W. 2nd Street, Suite 1900
                           Austin, TX 78701
14
                           Terrence J. Wikberg, Esq.
15                         Perkins Coie, LLP
                           700 Thirteenth Street, NW, Suite 600
16                         Washington, DC 2005-3960

17                         Amy E. Simpson, Esq.
                           Perkins Coie, LLP
18                         11452 El Camino Real, Suite 300
                           San Diego, CA 92130
19
                           Matthew Cook Bernstein, Esq.
20                         Perkins Coie LLP
                           11452 El Camino Real, Suite 300
21                         San Diego, CA 92130

22 Court Reporter:         Kristie M. Davis, CRR, RMR
                           PO Box 20994
23                         Waco, Texas 76702-0994
                           (254) 340-6114
24      Proceedings recorded by mechanical stenography, transcript

25 produced by computer-aided transcription.

1          (August 25, 2021, 1:31 p.m.)

2          DEPUTY CLERK:  Discovery hearing in Civil Action

3    W-19-CV-656, styled TruSun Technologies, LLC, The Johnston

4    Family Trust and John F. Johnston versus Eaton Corporation and

5    Cooper Lighting, LLC.

6          THE COURT:  If I could have announcements, starting with

7    the plaintiff.

8          MR. GREENE:  Bert Greene on behalf of the plaintiffs.  And

9    with me in listening only mode today, Your Honor, my colleagues

10   Pierre Hubert and Andrew Liddell.

11         THE COURT:  Welcome, all.

12         And for defendant?

13         MR. TYLER:  Good afternoon, Your Honor.  This is Craig

14   Tyler on behalf of the defendants.  We've got a pretty good

15   crew today.  It's myself, Terry Wikberg, Amy Simpson, Adam

16   Hester and, recently joining us, Mr. Matt Bernstein.

17         So you may hear from one or more of us, depending on what

18   issues we take up.

19         THE COURT:  Okay.  Glad to see that it's not too early for

20   Mr. Bernstein to be here.  I know it's pretty early in San

21   Diego.  So it's -- well, I guess it's after -- it's almost

22   noon, so I guess we're okay.

23         I'm happy to take up all the issues that we have.

24         Whoever wants to get started is welcome to.

25         MR. TYLER:  This is Craig Tyler from the defendants' side.

1    We would probably prefer to take up the motion to strike first

2    because we think it goes through a lot of issues, but of course

3    I'm interested in hearing what Bert wants to take up first too.

4          MR. GREENE:  That's fine by me, Craig, and that's fine by

5    me, Your Honor.

6          THE COURT:  Okay.  Let's do that.  Good decision.

7          MR. TYLER:  Thank you, Your Honor.  This is Craig Tyler.

8    May it please the Court.

9          I'll be handling the -- this particular motion.  And I

10   wanted to start off by just being clear about what it is we're

11   asking the Court to do on this motion.

12         First, we are asking that the Court strike the new

13   infringement contentions, specifically Exhibits S1 through S7

14   in our motion to strike, that were served in July.

15         The second item we would like to address is, now we have

16   sort of a further complicated issue in that some of the new

17   amendments in those contentions have found their way in the

18   expert reports, and so we have to deal with that as well.

19         We'd ask that the plaintiffs have a few weeks to issue new

20   expert reports that are -- that contain the information in the

21   timely served infringement contentions.

22         And then we would, thirdly, ask that the schedule be

23   adjusted so that we can deal with the new infringement reports.

24         So that's our ask, and I'll go into why, unless there's

25   any questions about what we're asking for.

1          THE COURT:  I think I've heard this argument before.

2          Mr. Greene?

3          MR. GREENE:  Your Honor, yeah.  If I can jump in real

4     quick.

5          They just filed a motion to strike portions of the expert

6     report this past Friday.  So we would certainly want a chance

7     to at least brief that issue before arguing expert reports

8     today.

9          The only motion to strike on the table and that's been

10    fully briefed is their motion to strike the supplement that we

11    served to our infringement contentions.

12         THE COURT:  Okay.  I got the sense -- and maybe I'm

13    wrong -- from Mr. Tyler that if everyone were to have -- if you

14    were to supplement your expert reports and everyone were to

15    have more time, that that might be a solution that would work.

16         Mr. Tyler, is that fair?

17         MR. TYLER:  Well, it depends on how long we have, because

18    there is an issue of where we are, and I can talk about why

19    this really matters because we need to probably put some new

20    prior art in the case.  And I want to explain why that is.

21         THE COURT:  Well, Mr. Tyler, so if I'm going to give

22    Mr. Greene some relief, typically what I try to do is, I try to

23    give everyone -- I try to give relief so that Mr. Greene can

24    put on as fulsome a case as he wishes and you to defend it in

25    as fulsome a way as you want to.

1      So why don't we do this?  Mr. Greene, I'm not going to

2  strike the amended infringement contentions, but tell me by

3  when you think you could have amended expert reports.

4      MR. GREENE:  So to be clear, Your Honor, our infringement

5  report served on August 6th doesn't need a supplement.  We --

6  it fully reflects the arguments and the evidence we want to

7  cite in the case.

8      So --

9      THE COURT:  Okay.

10      MR. GREENE:  -- I'm a little bit confused by the

11  suggestion by Mr. Tyler that we need a supplement.  We don't

12  need to supplement.

13      THE COURT:  Okay.  So, Mr. Tyler, given that I've denied

14  your request for relief with what you are concerned with, how

15  much additional time do you believe that you need to get -- to

16  do additional research on art that might invalidate?

17      MR. TYLER:  I'm going to answer your question first,

18  because you've asked me that question, probably two and a half

19  to three months.

20      Now, I would like to address, if you don't mind, Your

21  Honor's decision on the motion just real quickly, because I

22  think there's some confusion about --

23      THE COURT:  Okay.  There might be.

24      MR. TYLER:  We have a rule in this Court, Your Honor,

25  that, you know, we spent a lot of time going through and

1   developing why we would have final invalidity and infringement

2   contentions in this Court.

3        And as you experienced, as I've experienced, as

4   Mr. Greene's experienced, when you didn't have that deadline in

5   other courts, well, you'd have evidence come in the case and

6   you wouldn't know who had to seek leave and who didn't have to

7   seek leave and how that happened.

8        My understanding, when we were putting this into place,

9   final infringement contentions and final invalidity

10  contentions, if you were going to make an amendment after that

11  date -- and in this case, Your Honor, that date was December of

12  2020 -- if you're going to do that, if you're going to make an

13  amendment after that date, you've got to seek leave of Court.

14       And, Your Honor, here the plaintiffs did not seek leave of

15  Court at all.  We invited them to do that by letter.  We raised

16  the issue in our motion, and they said --

17       THE COURT:  I'm with you, and that's a fair point.

18       Mr. Greene?

19       MR. TYLER:  You know, this is something that --

20       THE COURT:  I'm -- Mr. Tyler, I got it.

21       Mr. Greene, Mr. Tyler's certainly right, that ordinarily I

22  would anticipate that someone ask for permission to do

23  something if it was past the deadline that was in the order.

24  That's certainly the intent of the default orders.

25       So what is your response to that?

1      MR. GREENE:  So, Your Honor, our response is that the

2  supplement we served is in no way an amendment of our

3  contentions because it's entirely consistent with the

4  infringement theories and our contentions.

5      The only reason we served the supplement is, 15 months

6  after we served the original contentions with, you know, two

7  months left in the discovery period, they send us a letter

8  telling us that they don't think the representative product

9  that we charted in the original contentions is, in fact,

10 representative.

11     And so to moot that issue, we served them a supplement

12 that pointed them to the specific evidence that we intend to

13 rely on for all of -- for each of the accused products, and

14 that -- that evidence is consistent with the infringement

15 theories; and, therefore, there was no need to seek leave.  And

16 that's our position.

17     THE COURT:  And then you provided your infringement expert

18 report in a timely manner and you don't seek to supplement

19 that, right?

20     MR. GREENE:  That's right.

21     THE COURT:  So, Mr. Tyler, I'm missing how you've been

22 injured by this.

23     MR. TYLER:  I'm really glad you asked, Your Honor.

24     And I might need to show you some of the exhibits, but

25 realize for the -- for 99 percent of this case, we've been

1   building a prior art case, our noninfringement defenses based

2   on what was in the timely submitted contentions.

3        And we kind of saw this coming, so we wanted to flush it

4   out.  If they were going to change gears, they needed to seek

5   leave.

6        Instead, you know, they went forward with amendments.

7   And, Your Honor, I -- I need to -- I hope you have some of the

8   exhibits with you.  These are amendments.  If these aren't

9   amendments, then I don't know what is.  I really don't.

10       And if you don't mind, Your Honor, I'd like to address why

11  this is important.

12       If you look at Exhibit 1 or Exhibit A of our motion, this

13  is the timely served infringement contentions that we have in

14  the case.  And to refresh Your Honor, this is a system, on Page

15  1, you can see it's a light-generating system for -- you know,

16  it's lights, large lights, like stadium lights.

17       Does Your Honor have that exhibit handy?

18       THE COURT:  I do not have it in front of me.

19       MR. TYLER:  Okay.  Well, perhaps I can make the record and

20  perhaps I can persuade you to reserve judgment just a little

21  bit.

22       What I can do, I can share it and show it to you; but then

23  problem is, we've got a lot of public participants on this

24  hearing and that might be cumbersome, and I want to be mindful

25  of time.

1          THE COURT:  I'm not worried about time.  That's fine, if

2     you want to do it that way.

3          MR. TYLER:  Okay.  So I would like to refer to some of

4     these exhibits, which I believe are under seal.  And so I would

5     ask that anybody who is not under the protective order in the

6     case to please drop off or -- for the time being.

7          (Clarification by the reporter.)

8          MR. TYLER:  Okay.  So let's see if I can do this now.

9          Your Honor, can you see my screen that I've shared, which

10    is -- it says Exhibit 1, but it starts Exhibit A?

11         Do you see that?

12         THE COURT:  No.

13         MR. TYLER:  Okay.  Now do you?

14         THE COURT:  Yes, sir.

15         MR. TYLER:  All right.  So this is Exhibit A, and going to

16    the first page, we have -- you know, I just wanted to refresh

17    the Court that we're talking about larger lights.  These aren't

18    just household lights, but it's a light-generating system.

19         And what I wanted to direct the Court's attention to,

20    starting on -- we go down to the heat sink element, which

21    starts on -- I'm sorry, Page 9 for the record -- actually,

22    Page 8.  We see that we have a heat sink.  And we spent some

23    time talking about this at Markman, but just to refresh.

24    Obviously you've had a few Markman hearings since then.

25         The heat sink is important in this case, and it has a body

1   portion and it has a thin portion.  And just to kind of jump to

2   the appropriate element, if we go down to -- this is on Page

3   22 -- there is a temperature detector subassembly, and that

4   temperature except -- the detector subassembly is -- here on

5   Page 23 -- it's adapted for sensing a heat sink temperature of

6   the heat sink at at least one location.

7   ████████████████████████████████████████

8   ████████████████████████████████████████████

9   ████████████████████████████████████████████

10  ████████████████████████████████████

11       And so it's important to know where that heat sink is,

12  Your Honor.  And going back to what I talked about before, what

13  we had, up until July, you've got infringement contentions that

14  specifically point out the portions of the heat sink.

15       This is for one of the accused products.

16       Here's another accused product.  They talk about the body

17  portion of the heat sink.

18       Here's another accused product, Your Honor, on Page 11,

19  body portion of the heat sink.

20       And that's important in this case as to where that is

21  because ultimately we're going to have to see that they're

22  detecting that temperature of the heat sink at the location.

23  And that's critical in this case.

24       So -- and there's a dispute where the -- what temperature

25  is taken and where that temperature is taken.  So, I mean,

1   you've been down this road in a lot of cases, right?  We've

2   produced a lot of evidence, and we don't think that we detect

3   temperature at the heat sink.  It's a prime dispute.

4       Now I'm going to shift over to what we got in July.  This

5   is S5 and -- to our motion.  And now in July we have a separate

6   infringement contention for every product.  And if we move to

7   the heat sink -- and, I mean, the pictures are different, and

8   we're not just talking about pictures.

9       But if you move to the heat sink and this important

10  component, and if you read what's said on Page 3, you're not

11  going to see any more boxes drawn around anything.  Instead,

12  you're going to see something pointed to a substrate,

13  thermally-dissipative substrate, housing interfaces, inner

14  casings, power supply casings.  Those all together form the

15  body portion of heat sink.

16      And now we talk about where the fins are, but there's no

17  body portion of the heat sink, Your Honor.  And that's a

18  fundamental change.

19      There's a lot more evidence.  And if you just do the eye

20  test on these, you'll see that they are amendments.  But to

21  call this not an amendment and just a supplementation, it's

22  very much a change.  And it brings into play the fact that

23  there's prior art now that we could have brought into the case.

24      If you're looking elsewhere, outside of what you think of

25  as just the body portion of the heat sink and now you're

1 ███████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████                 That's a

4 change.  You can't call it just a supplementation.

5      And this is exactly what our rules were designed to not

6 allow without leave.  So if -- I mean, I agree with Your Honor,

7 that this can probably be cured with time, and that's where

8 you're leaning, but fundamentally, these rules have to mean

9 something.  And to call this just a supplementation is

10 disingenuous.

11      And I have other examples that I could point out as well,

12 Your Honor, but I think this one provides the point.

13      And I'll go ahead and stop there because I know we have a

14 lot of things to cover, and I know Your Honor's already

15 predisposed on this issue.  But I wanted to go ahead and make

16 sure that it was clear what was going on here, because, you

17 know, I've been in a lot of these situations on both sides, and

18 I know Your Honor has as well.  And, you know, this is why we

19 have this rule.  And it's my first time to encounter it.  And

20 do you have to -- you have to play by the rules or not?

21      That's fundamentally what the question is here.  And just

22 looking at the prejudice and say, well, you can miss the date

23 by eight months and, yeah.  We'll cure it with the prejudice.

24      I mean, we spent a lot of time and energy developing our

25 invalidity case around looking at where they had pointed to the

1    temperature.  And now we have -- we mention this in the -- it's

2    not just about this one issue.  You know, we have completely

3    different evidence that we're having to deal with.

4         And some of the evidence that was -- well, actually some

5    of the primary evidence in the PICs that was there to begin

6    with is gone.

7         So, you know, we're trying to deal with our own experts.

8    What part of the case do you deal with?  Do you trash

9    everything you've been working on and start from scratch?

10        So we -- if Your Honor's asking about time frame, I think

11   it's at least three months.  But fundamentally, it's just not

12   fair.  I mean, this is why we have rules, and we've spent a lot

13   of time and our clients have spent a lot of money litigating

14   this case based on one set of contentions.

15        They didn't file anything when the final infringement

16   contentions deadline came by.  And it wasn't till we said, hey.

17   If you're going to change your case, you've got to seek leave.

18   That was not an invitation for them to do it on their own and

19   grant themselves leave.

20        So I appreciate your time on this, Your Honor.

21        THE COURT:  Mr. Greene?

22        MR. GREENE:  So, Your Honor, as the Court is well aware,

23   the purpose of infringement contentions is not to prove the

24   case.  We prepared the infringement contentions at the time

25   that they were due based on the publicly available information

1   that we had available to us.

2        And so the notion that our infringement contentions

3   doesn't cite to every piece of evidence we're going to rely on

4   to prove our case is completely unremarkable.  And, in fact,

5   that's how the process is supposed to work.

6        And so what we pointed to in the infringement contentions

7   and what Mr. Tyler was just pointing you to in the supplement

8   are not in any way inconsistent.

9        So the notion that we've changed horses or we've changed

10  theory is not true.  It's not correct.  And, in fact, all we

11  did was point to the specific evidence that we're going to rely

12  on to show that there's a heat sink and that temperature is

13  measured from the heat sink, and that just isn't inconsistent

14  with what we said in our contentions.

15       And in fact, Your Honor, this exact issue was at play

16  during Markman.  They made -- they made arguments in their

17  briefing about why they wanted the constructions they wanted so

18  that we wouldn't be able to argue infringement based on the

19  heat sink encompassing multiple things inside the device.

20       And so they've been aware of this argument.  It seems

21  like, to us, what they decided to do was wait until nearly the

22  close of discovery and lay behind the log and then jump out and

23  say, hey.  Your contentions aren't sufficient.

24       And of course if they were going to raise an issue with

25  the sufficiency of the contentions or with confusion as to what

1   the infringement theory is, they had plenty of time to do that.

2   They waited 15 months to raise any issue with the

3   representative product that we charted.

4        And so to the extent that time has gotten crunched here,

5   Your Honor, it's of their own making by laying behind the log.

6   And in fact, Your Honor, on the issue of prejudice, they cited

7   our supplement multiple times in their invalidity report.  And,

8   in fact, they introduced 19 new pieces of art in their

9   invalidity report that wasn't in their own contentions.  And so

10  they've clearly accounted for any quote/unquote "new"

11  information from the supplement in their expert report.

12       And so that's our problem with pushing back dates, is it

13  seems like what they want is a do-over on their contentions, on

14  their expert report, and just stringing this case out that's

15  now, you know, five months from trial.

16       So if the Court feels like the fair thing to do is to give

17  them additional time, we certainly respect that, but just want

18  to note that they have accounted for the supplement in their

19  expert report that was served on August 6th.

20       MR. TYLER:  May I respond, Your Honor, on one point?

21       THE COURT:  Sure.

22       MR. TYLER:  So the issue about determining temperature on

23  the heat sink thereon, that wasn't a Markman issue.  We didn't

24  go through Markman on that particular issue.

25       But this is flipping the burden of this rule.  This is

1  supposed to be plaintiff's burden to show that this is an

2  allowable amendment.  The burden shouldn't be on us.  This is

3  why we have these rules.  To flip this burden, if you wait

4  until after December 4th, 2020 in this case, and it's -- this

5  is not fair, the way that this is working out, that it's our

6  burden.

7          So we didn't lay behind the log.  If anything, we made

8  sure that they weren't going to change the case or we tried to

9  flush them out early.

10          You know, that's the point I wanted to respond on, is this

11  was not an issue we talked about during Markman.  And as far as

12  this being a bed of our own making, absolutely not.  The rules

13  are designed to make sure that plaintiffs are the ones that

14  have to come asking the Court for what they've done.  And, Your

15  Honor, they haven't done that.  They still haven't done that.

16          So thank you, Your Honor, for your time.

17          THE COURT:  Mr. Greene, anything else?

18          MR. GREENE:  The only thing I would say in response, Your

19  Honor, is it seems like their biggest beef is that our

20  contentions didn't point to all the evidence we intend to rely

21  on for infringement.  And of course that's not the point of

22  contentions.  The point of contentions is to put them on notice

23  of the theories, and the contentions did that.

24          And of course after we got significant technical documents

25  and code and such from them, then to try to moot this dispute

1  and head it off at the pass, we went ahead and told them the

2  evidence we were going to point to, which we weren't even

3  required to do.  But -- so we served the supplement really to

4  try to moot this issue of, surprise, we don't know what you're

5  going to point to.

6          And so that's why we did that, Your Honor.  It wasn't an

7  attempt to change theories or change contentions.  And, in

8  fact, if they didn't think the product was representative such

9  that they couldn't participate in discovery for other products

10  and produce the things they needed to produce, they should have

11  raised that, and they didn't.

12         They produced technical documents.  They produced code.

13  They never raised their hand and said, we don't know what

14  you're pointing to as the heat sink, so we don't know what

15  documents to produce.

16         They produced the documents because they knew exactly what

17  we were pointing to as the heat sink.  And so there's no

18  surprise, there's no changing theories, there's no changing

19  horses.

20         And with that, I'll be quiet, Your Honor.

21         THE COURT:  I'll be back in a few seconds.

22         (Pause in proceedings.)

23         THE COURT:  If we could go back on the record.

24         So I know both of you, and I actually know both of you

25  very well.  And you're actually much more passionate over

1    infringement contentions than I was ever able to muster.

2         But something -- if you ever have the opportunity to be in

3    the position that I'm in, what you realize happens is, in this

4    case, Mr. Greene did what he thought was what he was supposed

5    to do and, I think, acted in good faith.

6         Mr. Tyler, you were offended by what he did because you

7    thought he didn't do everything he should have under the rules.

8    And even if you aren't technically prejudiced, you think he

9    should have done something differently than what he did.  And

10   so then I'm left to try and figure out what is fair here.

11        I don't think it's fair here to strike the additional

12   claims.  And that actually comes more from the fact that I try

13   to protect the plaintiff's right to -- absent bad faith, to

14   have, you know, get -- assert whatever they want to assert.

15        I feel the same way about your case in terms of

16   invalidity, absent bad faith, and there's none on your part.

17   People ought to get the opportunity to do whatever invalidity

18   they need to do.

19        So, but here's what I'm going to do.  I see we have other

20   issues to take up.  The next one that I had on y'all's chart

21   was -- and that's why I was a little caught off guard was,

22   you -- the chart that I had from my law clerk that I'd gone

23   over preparing for this didn't include the issue that you all

24   raised first, and so I was -- which is fine.  We muddled -- I

25   muddled through.

1    But I'm going to take up the other issues and go through

2 them, and then we will come back -- I'm going to give you more

3 time, Mr. Tyler, to do invalidity.  I just -- I'd like to kind

4 of hear everything.  And so -- and we can figure out what to do

5 on the case, from a macro level, and go from there.

6    So the next issue is plaintiff's request for discovery

7 from Eaton, which is E-a-t-o-n.

8    MR. GREENE:  Thank you, Your Honor.

9    I want to be real, real clear and careful here, Your

10 Honor, that our beef on this issue is not -- I hope it doesn't

11 come across as throwing rocks at counsel.  Because I know

12 everyone in these cases does the best they can to represent

13 their client's interest.  And to some degree, they're limited

14 by the willingness of their client to participate in the

15 process.

16    But what we have here, Your Honor, is a named defendant,

17 Eaton Corporation, who effectively refused to participate in

18 the discovery process.  And that's not appropriate, and it's

19 not acceptable under the rules.

20    When we originally filed this case, we brought claims

21 against Eaton Corporation and Cooper Light, two separate

22 entities that were related at the time.

23    In the allegations, what -- they were both involved in

24 selling and promoting the accused products and that certainly

25 Eaton was involved in obtaining patents for their behalf that

1  we allege our client should have been a named inventor on.

2      In March of last year, the defendants brought a Rule

3  12(b)(6) motion against most of the claims in the complaint,

4  seeking -- and one of their grounds for dismissal was that

5  Eaton -- the claims against Eaton should be dismissed because,

6  in their view, Eaton is not a proper party to this lawsuit.

7      The Court denied that motion in total and found that the

8  arguments raised were not appropriate for a resolution on --

9  certainly on the pleadings.

10     And then fact discovery opened up in October of last year

11 after the Markman.  And ever since then, Your Honor, the

12 defendants have refused to produce fulsome discovery from

13 Eaton, and their objections has been that Eaton is not a proper

14 party to the lawsuit.

15     And so in our mind, they've essentially ignored the

16 Court's denial of their 12(b)(6) and decided to act as though

17 the Court granted the motion and that Eaton was out of the

18 case.

19     And this is obviously not how discovery works in our

20 system.  As long as you're a party to the case, you have to

21 participate in the process.  You don't get to engage in

22 self-help, especially in contravention of a court ruling on

23 that issue.

24     And of course, Your Honor, the fact that a party believes

25 themself not to be a proper party to a lawsuit is not a basis

1   to refuse to participate in discovery, and defendants know this

2   because they've subpoenaed a number of nonparties in the case.

3   So whether you're a named party or even a nonparty, that's not

4   a basis to say, we don't want to participate.

5       And, in fact, all of the nonparties they've subpoenaed in

6   this case -- and there's several of them, and some of them are

7   international -- have provided depositions and have provided

8   documents.  And they didn't come back and say, we're not going

9   to participate because we're not a party to your lawsuit.

10      In fact, Your Honor, the defendants even subpoenaed the

11  wife of my client, the inventor in this case.  And she is

12  obviously a nonparty to this case, and yet she gave them a

13  deposition.  And she didn't refuse to participate in discovery,

14  which frankly really highlights how outrageous it is that Eaton

15  has refused to participate, despite being a named party to the

16  lawsuit.

17      They've produced about 17 documents from Eaton -- I think

18  that's the number -- have refused to do any sort of fulsome

19  search in response to our discovery requests or e-mail

20  searching, even though the parties have been producing e-mails

21  in this case.

22      And, Your Honor, we served interrogatories on Eaton,

23  including asking things like the names of persons with relevant

24  knowledge, and they told us to pound sand on those

25  interrogatories.  We served a 30(b)(6) asking for 30(b)(6)

1  testimony from Eaton.  They refused to give us a witness from

2  Eaton.

3      And we know for a fact, Your Honor, that Eaton possesses

4  relevant documents and relevant knowledge because 30(b)(6)

5  witnesses provided by Cooper confirmed that to be the case.

6  They used to be related corporate entities, and Cooper has

7  since been sold to Signify, who's now another defendant in the

8  case.  And there are Eaton employees, that still work at Eaton,

9  that show up in their privilege log, and yet they refuse to

10 provide any e-mail discovery or witnesses from Eaton.

11     So I think that summarizes for you, Your Honor, what the

12 dispute is.  Obviously discovery closed back on July 30th and

13 it closed without us getting the discovery we were seeking from

14 Eaton.

15     We brought this dispute to the Court back in April, and I

16 know the Court is extremely busy and so certainly understand

17 that the Court hadn't had a chance to get to this until now,

18 but we would be very appreciate if the Court would order Eaton

19 to provide substantive responses to our discovery requests and

20 to stop refusing to provide a 30(b)(6) witness.

21     THE COURT:  Response?

22     MR. WIKBERG:  Your Honor, this is Terry Wikberg from

23 Perkins Coie on behalf of the defendants.  I'm a little

24 perplexed, and I'll see if I can march through this as

25 efficiently as possible.

1      One, the wife of one of the plaintiffs that we deposed is

2  the trustee of one of the plaintiffs, the Johnston Family

3  Trust, which is the owner of the asserted patent.  She is the

4  signator on numerous documents.  We didn't throw out a subpoena

5  to depose someone's wife for the purposes of deposing --

6      THE COURT:  I don't care about that.  I don't care about

7  any of that.  I don't care about why you did something.

8      MR. WIKBERG:  Very good.

9      THE COURT:  I care about, Mr. Greene tells me he wants

10 discovery from a party and that you're not giving it.

11     MR. WIKBERG:  Understood.

12     Now, we have to understand exactly what happened here.

13 The primary entity at issue is Cooper Lighting.  That's the

14 primary defendant.  They are the seller of the products at

15 issue for purposes of patent infringement and were, up until

16 recently, the owner of the patents that the plaintiffs are

17 claiming to be an inventor on.

18     Those patents were acquired from another entity back in

19 2015.  The entity that acquired that -- the defendant that

20 acquired that entity was Cooper Lighting, not Eaton.  We have

21 produced documents to that effect.

22     Then in late 2019, shortly after this case was filed and

23 the transaction was closed, in early 2020, Signify Corporation

24 -- or Signify N.V. acquired Cooper Lighting from Eaton, so

25 Eaton sold this related company.

1      All of the technical information, all of the related

2  transaction information relevant to this acquisition was given

3  to Signify from Eaton.  Eaton, in a sense, washed its hands of

4  Cooper Lighting, which is the owner of the patents-at-suit and

5  seller of products that are accused of infringement.

6      All of that information has been produced.  Cooper

7  Lighting possesses the relevant information as they were the

8  entity within the Eaton empire, if you will, that's relevant to

9  all of this transaction.

10      We produced that document showing that it wasn't Eaton

11  that purchased this original company in 2015, it was Cooper.

12  So their predicate as to why Eaton should be in the case was

13  incorrect.

14  ████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ██████████████████████████████████████████████

17  █████████████████████████████████████████

18  █████████████████████████████████████████████

19  ████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ███████████████████████████████████████████████

22      To suggest that Eaton hasn't produced anything is not

23  quite correct.  Like I said, the relevant documents related to

24  this case existed with the entity Cooper, and those were

25  produced with Cooper Bates stamps.

1        So to suggest that --

2        THE COURT:  Hold on just one second.

3        MR. WIKBERG:  Yeah.  Sure.

4        THE COURT:  I'll be right back.  I need to check something

5   with my clerk.  I'll be right back.

6        (Pause in proceedings.)

7        THE COURT:  Okay.  Let's go back on the record.

8        What I was trying to figure out was whether or not you

9   guys had -- by "you," I meant the defendants -- had had -- is

10  the 12(c) motion you have --

11       MR. WIKBERG:  Yes.  I was going to get to that, Your

12  Honor.

13       THE COURT:  You read my mind.

14       MR. WIKBERG:  So I'll go -- I'll get to that right now.

15       It is our firm belief that the unjust enrichment -- the

16  equitable claims, if you will, in this case are time barred.

17  The only -- to the extent there is any relevance as to Eaton --

18  and we have to be clear -- what -- a point I didn't make yet

19  is, we have repeatedly told the plaintiffs they have sued --

20  they've named the wrong Eaton entity, that the entity that was

21  sued did not acquire Cooper, had no connection to Cooper.

22       I mean, it's a complicated corporate structure, and we've

23  told them this over and over, and they just -- they don't

24  appear to listen.

25       But anyway, with respect to the 12(c) motion, the only

26

1   discovery that is potentially relevant, if at all, to this case

2   would be related to the equitable claims.  Like I said, there

3   are patent infringement claims and these equitable -- patent

4   infringement is Cooper and Signify.  They are -- very clearly

5   those claims have been assumed by Signify.  There's nothing

6   that Eaton retains.

7       So the only thing left is related to these time barred

8   claims.  So we believe, which was the conclusion of my argument

9   today, that to the extent this is to be considered at all by

10  the Court -- and we don't believe it should -- it should be

11  tabled until a decision on that 12(c) motion is made, because

12  if these claims --

13      THE COURT:  I got it.

14      Mr. Greene, what discovery, if any, do you need to

15  preclude me from considering the 12(c) motion?

16      MR. GREENE:  So, Your Honor, there's a threshold issue

17  there is, we completely disagree that the only claims that are

18  relevant to Eaton are the equitable claims.

19      It's probably necessary for me to give Your Honor just a

20  little bit of the historical background so you have some

21  context for what I'm about to say.

22      THE COURT:  Well, actually, you know, here's what would

23  help me more is -- what I would care about more is:  Do you

24  have claims in your complaint against Eaton that are not

25  equitable?

1      MR. GREENE:  Yes.  We believe that there are infringement

2  claims that lie against Eaton.

3      THE COURT:  Okay.  Let me -- then let me go back to Mr. --

4  is it Wikberg?  Am I pronouncing that correctly?

5      MR. WIKBERG:  Yes, Your Honor.

6      THE COURT:  Mr. Wikberg, if there are claims in the

7  complaint, then why should the plaintiff not get discovery to

8  support those claims?  Not -- I'm talking about non-equitable.

9      MR. WIKBERG:  I don't know what Mr. Greene is talking

10  about, to be completely frank.

11      The only claims in the complaint are the equitable claims

12  for damages, okay?  Let's set those aside.

13      Patent infringement, Eaton never sold these products.

14  Cooper did.  And the Eaton entity has been sold to Signify.  So

15  the appropriate parties are here in this case.  They are

16  Cooper, the lighting company that actually sold the products

17  and designed them and did the R&D and marketed them, etc., and

18  Signify, now the current owner of the Cooper entity.

19      The other claims -- so that's patent infringement.  The

20  other claims are correction of inventorship.  Eaton never owned

21  patents.  They were owned by Cooper through their acquisition

22  of this other company in 2015, and now they are owned by

23  Signify.

24      I don't -- Eaton has never sold the products at issue.

25  They currently don't sell the product.  They've sold the

1  entity --

2      THE COURT:  I got it.  I got it.

3  ████████████████████████████████████████

4  ██████████████████████████████████████████

5  █████████████████████████████████

6      THE COURT:  Mr. Greene -- I'll note that Mr. Wikberg is

7  even more passionate about a 12(c) motion than you guys were

8  about their earlier motion.

9      If this keeps going, it should be just a great hearing

10 with each --

11     MR. GREENE:  What I'll say is this, Your Honor:  Eaton

12 bought the business that originally developed the accused

13 products.  Well, Mr. Wikberg is going to jump in and say that,

14 technically, the entity that bought that business, which was

15 called Ephesus Lighting, was Cooper Lighting.  It wasn't Eaton.

16     The problem for them, Your Honor, is that when that

17 business was acquired, Eaton put its name all over it.  There

18 are press releases saying, Eaton has bought Ephesus Lighting,

19 Eaton has patented technology now.  They went on every

20 marketing sale sheet for the products and re-branded the

21 business "Eaton's Ephesus Lighting."  So in our view, Eaton has

22 engaged in acts of offering to sell the accused products.

23     Now, at the end of the day, the entity that might have

24 booked the sale was Cooper Lighting, but that doesn't mean that

25 Eaton did not commit acts of infringement.  And we're going to

1   stand up in front of the jury and we're going to show them

2   these sales sheets that have Eaton's name on it, and they're

3   going to say, well, who the heck is Eaton?  Why aren't they

4   here?

5       Well, we want them to be there because they were involved

6   in selling the accused products.  And this issue of contractual

7   liability and that Eaton has sold off its liability when it

8   sold Cooper Lighting, well, that's true of any

9   indemnitee/indemnitor situation.

10      You know, Best Buy may have indemnity from Intel, but

11  plaintiffs sue Best Buy all the time and Best Buy has to go

12  seek indemnity from Intel on the back-end.

13      There's no rule that you can only sue the party that owns

14  contractual liability.  That's a contractual issue on the

15  back-end.  It doesn't limit who I can sue or who I can have as

16  a defendant in the case.

17      And I'm hoping that makes sense to Your Honor, but if you

18  have questions, feel free to --

19      THE COURT:  Nope.  Makes sense to me.

20      Mr. Wikberg?

21      MR. WIKBERG:  I suspect Mr. Greene is suggesting he's

22  allowed to get double the damages both from Cooper and then

23  from Eaton.

24      THE COURT:  I don't think Mr. Greene's at that point.  I

25  think Mr. Greene is saying he has evidence that the folks he

1  wants discovery from want to -- that sold the products, he has

2  an invoice or something, Mr. Greene; is that right?

3      MR. GREENE:  No.  It's the act of they marketed the

4  products, Your Honor.  They were involved in offering to sell

5  the products.

6      I mean, yes.  We -- we --

7      THE COURT:  Okay.  So what evidence do you have they were

8  involved in offering to sell the products?

9      MR. GREENE:  Their name is all over all the products.

10 They re-branded the product line "Eaton's Ephesus Lighting."

11 They didn't call it Cooper's Ephesus Lighting, they called it

12 "Eaton's Ephesus Lighting."

13     THE COURT:  And tell me specifically what discovery it is

14 that you want regarding Eaton.

15     MR. GREENE:  Your Honor, I mean, we've served a number of

16 discovery requests about this exact issue.  Their decision to

17 brand the business as Eaton's Ephesus Lighting, their

18 involvement in offering to sell these products, their

19 involvement in actually acquiring that business, Ephesus

20 Lighting.

21     We took the deposition of Cooper's president, and there

22 were certain questions about that acquisition in 2015 where he

23 had to tell us, no one at Cooper knows that information.  You

24 would have to get that from someone at Eaton because Eaton was

25 involved in that and we weren't involved in that.

1      And so we want to know.  We want to know:  Who -- who was

2  involved?  What did they value the business at?  All sorts of

3  things that Cooper doesn't currently know per their own

4  president.

5      THE COURT:  Mr. Wikberg.

6      MR. WIKBERG:  Your Honor, if I may, none of the things

7  Mr. Greene referenced are related to patent infringement.

8      And let's talk about the branding issue.  Eaton is a

9  company that has many sort of subsidiaries or affiliates, if

10  you will, and they have this branding strategy where everything

11  is under the name "Eaton."  It's just a marketing strategy.

12      Mr. Greene is in possession of both testimony and legal

13  documents making it very clear it was Cooper who sold the

14  lights, it was Cooper who designed the lights, it was Cooper

15  who booked the sales of the lights, it's Cooper's name on the

16  invoices and the purchase orders and the receipts.

17      And I -- I don't understand under what theory for purposes

18  of patent infringement or, frankly, any theory in this case

19  that Eaton is appropriate, well, for the reasons that I've

20  stated.

21      Now, to the extent, Your Honor, you are going to side with

22  Mr. Greene, I would suggest that we limit Mr. Greene's

23  discovery, to the extent you order any such, to patent

24  infringement issues until such time as the Court decides to

25  12(c) motion.

1    I will also say that we've just received their opening

2  damages report, and their expert has said, for purposes of the

3  unjust enrichment claims -- first of all, when it comes to the

4  patent infringement claims, no reference to Eaton and what

5  dollars Eaton may or may not owe or whether or not that the

6  expert was missing information from Eaton with respect to the

7  patent infringement damages.

8    But with respect to the unjust enrichment claims, the

9  expert said, the relevant date for determining the value of

10  those claims is January 1, 2020.  And that is -- you have this

11  in front of you, but that is after the Signify acquisition.

12  That has nothing to do with Eaton.

13    So the own expert's date as far as relevance as to value

14  of these equitable claims is months after Signify acquired the

15  Cooper entity from Eaton.  So we're just a little perplexed as

16  to what's happening here faced with the legal documents and

17  contractual obligations that Mr. Greene has been presented

18  with.

19    THE COURT:  I got it.

20    Mr. Greene, here's what we're going to do.  I'm going to

21  give you a five-hour 30(b)(6) deposition with Eaton.  Whatever

22  those topics are that you have told the lawyers at Perkins you

23  want to obtain from someone at Eaton, just turn that into a

24  30(b)(6) deposition.  And if they know as little as they say

25  they do, then it will be a relatively short deposition.  If

1    they know more, then you'll get the information.

2         And then if you need additional discovery as a result of

3    what you learn at that deposition and the folks at Perkins

4    disagree, then come back to me and let me know, and I'll go

5    from there.

6         Meanwhile, for the folks -- for the defendant, we will --

7    I will be taking a look at the 12(c) motion simultaneously.

8    I'm not prepared to rule on that today.

9         The next motion -- I'm sorry -- the next topic before the

10   Court is plaintiff's request to narrow defendants' invalidity

11   positions.

12        MR. GREENE:  And, Your Honor, this one has morphed a

13   little bit because time has elapsed, and so I'll bring you up

14   to speed to where we're at now and I think that should help the

15   Court.

16        The scheduling order -- as the Court knows, the Court's

17   form scheduling order now contemplates two different

18   meet-and-confers to narrow the claims in the case, both the

19   asserted claims and the prior art defenses.

20        In this case the contemplated dates were in March, and

21   then there's another second narrowing contemplated in October.

22   We reached out to them in March and said, look.  You're

23   currently asserting 50 something pieces of prior art combined

24   every which way to Sunday, so technically, mathematically, it

25   works out to millions of combinations.  Would you guys be

1  willing to narrow that?  And they said they would not.

2       They said we also needed to narrow our infringement case.

3  Well, we're asserting seven claims for one patent.  So from our

4  view, our infringement case is narrow.

5       So we felt -- you know, we squabbled over this over the

6  course of the spring.  And on August 6th, they serve their

7  invalidity report, which does, in fact, narrow the claims -- or

8  the prior art asserted to some degree, but they're still

9  alleging seven to nine combinations of art per asserted claim.

10       And so it's obviously significantly more than they're

11  going to go to trial with.  And so given that the scheduling

12  order contemplates a further narrowing in October, I think it

13  would be helpful for the parties, Your Honor, to get some

14  guidance from the Court on what sort of narrowing does the

15  Court contemplate in a situation like this and when does it

16  have to happen?  Can they roll right up to the trial date

17  continuing to assert nine combinations of art, and then we find

18  out the first day --

19       THE COURT:  No.  The answer is no.  Let me tell you how I

20  handle this.  So when is trial set?

21       MR. GREENE:  Currently set for January 10.

22       THE COURT:  Okay.

23       MR. GREENE:  I think that's right.  If somebody knows

24  different, please let me know.

25       THE COURT:  When are your expert depositions?

1      MR. GREENE:  Depositions?

2      THE COURT:  Yes.

3      MR. TYLER:  Your Honor, the close of expert discovery is

4  September 24th.

5      THE COURT:  A month from now?  A month from now?

6      MR. TYLER:  Right.  And we -- you know, we still have to

7  talk about the other issues with -- we talked about earlier.

8      But -- so it is interesting, this -- to talk about this

9  issue now about narrowing when we already talked about needing

10  to recalibrate or --

11      THE COURT:  Oh, my fix is going to -- is agnostic to the

12  problems you all have had.

13      (Laughter.)

14      THE COURT:  So here's --

15      MR. WIKBERG:  Your Honor, if I may.  This is Mr. Wikberg

16  again.

17      The schedule already contemplates, the schedule we have in

18  front of us, October 1 is the date where we are to meet and

19  confer and narrow issues.  So we don't understand the reason

20  we're -- it's coming up now.

21      And secondly -- well, first of all, there's only seven

22  prior art references in our expert report for invalidity.

23  Currently, that is.

24      And secondly, I mean, what Mr. Greene is proposing is a

25  one-way street.  He has 31 patents he's claiming the plaintiffs

1   are inventors on and five products against seven claims.  And

2   he's basically just proposing we need to limit our case.

3        So we already have this on the schedule.  I don't

4   understand why this is coming up.

5        THE COURT:  Mr. Wikberg, if you'll let me go.

6        MR. WIKBERG:  Sure.  My apologies.

7        THE COURT:  No problem.  So here's the way I deal with

8   both of these.  You all can pick a date that's mutual.  And if

9   you can't wind up with a date that's mutual, not unlike the way

10  I deal with my two sons, I will do it arbitrarily and without

11  concern about whether it's good or not for them.

12       But you all come up with a date after October 1st, prior

13  to trial.  I don't care if it's a month or two months or --

14  whatever it is is fine with me.  And by that date the plaintiff

15  will tell you which claims it's going to be asserting, and it's

16  going to be asserting all of those claims when it goes to

17  trial.

18       What I mean by that is, if Mr. Greene still has seven

19  claims by that date, then he'll be putting on seven claims at

20  trial.

21       You'll have a couple of weeks -- "you" being the

22  defendant -- will have a couple of weeks after that.  And at

23  that time you will tell Mr. Greene what art you're going to be

24  using at trial.  If you have -- whatever art you have on that

25  date, if I determine that it's -- if Mr. Greene's concern is

1   it's too much, you're going to be using all of it.

2         So that way Mr. Greene will have -- you'll have notice of

3   the claims and Mr. Greene will have notice of the art that

4   you're going to use.  And if I think either one of you has been

5   overgenerous in what you said and not realistic in what you cut

6   down, you will be putting evidence on all of those claims and

7   the art at trial.

8         So you all come up with a date by when you think that that

9   can be.

10        MR. TYLER:  Your Honor, can I have a clarification on

11  the -- his claims?  Because the one disagreement that we needed

12  some guidance about are the inventorship claims.

13        Part of Your Honor's (inaudible) --

14        THE COURT:  I can't hear you.

15        MR. TYLER:  -- include those.  There's 30 something

16  patents.  Each one of those, they would have to prove that they

17  were -- contributed to the conception of one of the claimed

18  elements.

19        THE COURT:  Mr. Tyler, I just couldn't hear you.

20        MR. TYLER:  I'm sorry.

21        The question was whether or not the inventorship claims on

22  30 different patents, whether those have to be narrowed as

23  well, because it doesn't make sense to narrow just the patent

24  case and then allow the inventorship claims to take up

25  90 percent of the trial.  We think that the inventorship claims

1   need to be narrowed as well.

2       And that's been a bit of a dispute between us and the

3   plaintiffs as to whether, you know, inventorship claims,

4   correction of inventorship needs to be included in the

5   narrowing or not.  We think it does.  They don't.

6       THE COURT:  Mr. Greene?

7       MR. GREENE:  I'm glad that that came up, Your Honor.  I

8   was hoping that we would get a chance to discuss that today.

9       I mean, inventorship is certainly an issue for the Court.

10  And so in our view, those inventorship claims are more

11  appropriately tried to the Court.

12      And so we can talk to Your Honor about what Your Honor

13  thinks that looks like, but we're envisioning that the

14  inventorship case would be tried to the Court and not to the

15  jury.

16      So I wanted to put that on the table today, if the Court's

17  interested in talking about it.

18      THE COURT:  Okay.  Then here's what we'll do.  When -- has

19  that been fully briefed, or is there a date by when it can be?

20      MR. GREENE:  You're talking about the inventorship case?

21      THE COURT:  Uh-huh.

22      MR. GREENE:  No.  There's been no briefing on the merits

23  of that case yet.

24      THE COURT:  Okay.  Well, then why don't I deal with that.

25  Is that going to require testimony and evidence at trial?

1       MR. GREENE:  No.  Not for the Court to decide the question

2  of whether or not correction of inventorship is warranted under

3  Section 256.

4       THE COURT:  Okay.  Then why don't you all brief that in a

5  manner that I can decide that before October 1st?

6       MR. GREENE:  Well, the question, Your Honor, is:  We think

7  that we would want to put evidence on because it's going to

8  rely on the credibility of the would-be inventor, and we would

9  want to play clips from the fellow inventors and that kind of

10 thing.

11      THE COURT:  Well, I thought I just asked if it's something

12 you were going to need -- I would need evidence on and you said

13 no.  So --

14      MR. GREENE:  Oh, I'm sorry, Your Honor.  I think I

15 misunderstood the question.  I thought you meant the briefing

16 of whether to try that to the Court.

17      No.  Those claims, the idea is, we would want to put

18 evidence on and have an opportunity to prove those up.  We just

19 think the Court -- trying those to the Court is more

20 appropriate, is what I'm trying to say inartfully.

21      THE COURT:  I think what Mr. Tyler is saying is that

22 you're going to be trying something to the Court that's going

23 to take up a lot of bandwidth and make it unfair to the

24 defendants or the -- however many defendants there are.

25      Is there a way we can do that -- you can put on -- we can

1  have a mini trial in advance of that to me and get it resolved

2  and -- so we -- you all can move forward knowing what the

3  answer is?

4      MR. GREENE:  I certainly think so.

5      THE COURT:  If so, I'm happy to do that in September.

6      MR. TYLER:  Your Honor, this is Craig for -- Craig Tyler

7  for the defendants.

8      I believe that a bench trial ahead of the regular trial

9  makes sense.  If -- to the extent that there are fact issues

10  that Your Honor feels he needs to hear from a jury, I suppose

11  you could submit those to the jury when we have the jury trial.

12      THE COURT:  I don't -- if I'm deciding it, I'm not going

13  to -- I don't really care what the jury --

14      MR. TYLER:  This is really the first time that we've had

15  this specific discussion because it's always been ships passing

16  in the night as to whether this has to be narrowed or not,

17  whether it is a question of law for the Court or does it go to

18  trial.

19      So I think we would be okay with a bench trial as well.

20      THE COURT:  Then you all come up with a briefing schedule

21  on what the issues are and get with my clerks, and we'll set a

22  bench trial.

23      And by the way, I'm fine -- entirely up to you all, I'm

24  happy doing it in person, I'm happy doing it by Zoom too.  You

25  can put your -- you can bring your witnesses, we can do it

1    live, or you can put your witnesses on by Zoom and I can do it

2    that way.  Totally up to you all, whichever's easier.

3         MR. TYLER:  Thank you, Your Honor.

4         THE COURT:  Just -- just set the date ahead of

5    October 1st, and I'll get this resolved.

6         MR. TYLER:  Okay.  I would want to mention for the Court

7    that the 12(c) motion that Your Honor's going to take up would

8    directly impact and probably negate the need for that trial,

9    but -- so we just wanted to make sure that that was something

10   on the Court's radar.  That's why we filed it.

11        THE COURT:  Well, if I grant it, then we may not need a

12   trial.  And so...

13        (Laughter.)

14        MR. GREENE:  Just to be clear, Your Honor, we completely

15   disagree.  The 12(c) only relates to the equitable claims, not

16   to the question of whether or not inventorship should be

17   corrected on those patents.  Those are separate causes of

18   action under the law.

19        THE COURT:  Well, I haven't -- I didn't -- the --

20   unfortunately, the way I got -- what I got to prepare for

21   today, it didn't have the motion in it.  So I wasn't -- I

22   didn't look at the motion.

23        I mean, I got -- y'all -- I think I had a chart that got

24   prepared.  And so I've got a bunch of stuff to take up, but

25   that was something I didn't know to look at in advance.

1      So I will look -- I have it down.  We will look at the

2   12(c) motion, and I'll then be in better shape to figure out

3   the ramifications.

4      But assuming you're right, Mr. Greene, that regardless of

5   what I do on the 12(c), go ahead and be planning on finding a

6   time on my September docket to have a bench trial where I can

7   resolve this issue.  Because I can always -- if I decide you're

8   wrong, I can cancel it.  But the longer we wait to set it, the

9   harder it is.  So just find a time to get me in there.

10      So give me one second.

11      MR. TYLER:  And, Your Honor, might we be able to have an

12   opportunity to meet and confer to see how much time Mr. Greene

13   anticipates needing for that, because talking about having a

14   bench trial within a month might be tight depending on where we

15   are, but...

16      THE COURT:  Mr. Tyler, with this many lawyers, I have no

17   doubt you all can get it done.

18      MR. TYLER:  All right.

19      THE COURT:  So I've dealt with the request to narrow

20   invalidity positions, extended deposition time is off.

21      Defendants request the discovery of waived privilege

22   communications, I'll hear about that.

23      MR. TYLER:  I believe Mr. Wikberg's going to cover that,

24   and he's trying to get off mute right now.

25      MR. WIKBERG:  Yes, Your Honor.  Again, Terry Wikberg.

1        At the beginning of this case, in the early complaints,

2   there was -- we filed our original motion to dismiss based on a

3   statute of limitations claim, that certain trade secret claims

4   were barred.

5        In response to that, in an effort to defeat that motion,

6   the plaintiffs produced a communication evidencing that --

7   between the -- one of the plaintiffs, Mr. Johnston, and his

8   attorney evidencing that he became aware of the patents -- the

9   Signify patents-in-suit inside the three-year statute of

10  limitations for trade secret claims.

11       Now, as an aside, that communication is outside the

12  two-year statute of limitations for purposes of the equitable

13  claims at issue and forms the basis of our motion to dismiss on

14  the pleadings, but we'll set that aside.

15       Prior to producing that communication, plaintiffs argued

16  that it was a privileged communication, even though it was

17  referenced in their complaint, that it was a privileged

18  communication and they would not produce it.  Eventually they

19  did produce it.  And again, like I said, it forms the basis of

20  our 12(c).

21       But what they haven't done -- and now we believe that that

22  production is a waiver as to when the plaintiff, Mr. Johnston,

23  has become aware of the Signify patents-in-suit.

24       We have deposed him.  He has no specific recollection as

25  to when he first became aware, although he remembers that

1   e-mail.  And so we believe the production of that privileged

2   communication, as asserted by the plaintiffs, represents a

3   waiver as to when the plaintiff, Mr. Johnston, has become

4   aware, whether it's via communication back and forth with their

5   counsel, as to the privilege -- the waiver of that privilege,

6   and we are entitled to other communications with or without --

7   and there are some communications on the privilege that are not

8   with counsel.

9       But any of those communications that directed to or

10  evidence knowledge by the plaintiff, Mr. Johnston, of the

11  patents-in-suit -- the Signify patents-in-suit, that is, then

12  we are entitled to that discovery.

13      It's a bit of sword-and-shield kind of --

14      THE COURT:  I got it.

15      Now, Mr. Greene, have you gone -- have you gone through

16  and determined whether or not there are any other documents?

17      MR. GREENE:  There's certainly a litany of privileged

18  documents, Your Honor, that they're seeking here.

19      THE COURT:  No, no, no.  I'm just talking about that would

20  fall in the bucket Mr. Wikberg just said, that you used one --

21  you used one e-mail to do X, to show X.

22      Are there any other e-mails that are related to the issue

23  that was contained in that e-mail that was privileged?

24      MR. GREENE:  No.  If I understand your question correctly,

25  Your Honor, no.

1          THE COURT:  There are other privileged communications but

2     none that would shed any greater light on the date issue that

3     that e-mail was relied on for?

4          MR. GREENE:  Certainly not the date that he learned that

5     they had started obtaining patents.

6          THE COURT:  Mr. Wikberg, what other basis do you have for

7     getting these communications?  I was with you on anything else

8     that was related to the purpose that they used it for and would

9     have -- and would require that.

10          In fact, I'll go ahead and order, Mr. Greene, if there are

11     any -- if there are any e-mails that are related to the issue

12     that Mr. Wikberg just identified about the date, you need to

13     produce them.

14          Now, you've represented to me there are none, but I just

15     want you to know, if you were to discover any, I would order

16     that those be produced.  But so far you're not producing any to

17     them.

18          MR. GREENE:  And let me make sure I understand, Your

19     Honor, what Your Honor's saying.

20          Are you finding that there's been a waiver here, Your

21     Honor?

22          THE COURT:  If you produced something -- if you -- as I

23     understood it, you produced a document that had to do -- that

24     was privileged that -- to support a point that you were making

25     with me.

1          MR. GREENE:  So that's not true.  I think that was an

2     incorrect representation of what happened, Your Honor.

3          THE COURT:  Okay.

4          MR. GREENE:  What happened was this:  In our complaint we

5     noted that our client first learned that they had obtained an

6     issued patent in late 2017.

7          Sorry.  Did we lose Your Honor?

8          (Clarification by the reporter.)

9          MR. GREENE:  So we said in the complaint that they -- the

10    client first learned that they had an issued patent that he

11    potentially should have been an inventor on in late 2017.

12         Of course there's nothing remarkable about disclosing a

13    fact that a client has learned from counsel.  It happens all

14    the time on the willfulness side.  You get served a rog that

15    says, when did you first learn of the existence of the asserted

16    patent?  And you respond to it, on this date from counsel.

17         That's not a waiver.  Okay?  That's disclosing a fact that

18    the client learned on a certain date.  And we cited a litany of

19    cases, Your Honor, in our papers on this issue, that disclosing

20    when the client learned a fact is not a waiver of privilege,

21    and it's not disclosing a privilege communication because --

22         THE COURT:  Well, Mr. Greene, here's the only universe of

23    documents I would want you to produce, based on what -- on

24    that:  If there's anything that is a communication that --

25    either to or from this witness which would call into question

47

1   whether or not he did, in fact, find out that information from

2   counsel about that date, then I would want it to be produced.

3       MR. GREENE:  Okay.  I'm not aware of any such

4   communication about that date.

5       THE COURT:  Okay.  Then I'm going to move on to the next

6   issue of discovery of samples of accused products evaluated by

7   plaintiffs in infringement contentions.

8       MR. TYLER:  Your Honor, this is Craig Tyler.  I can

9   probably address that, because to the extent Your Honor's

10  inclined to allow the late-filed amendments into the case, then

11  it's probably not as important for us to move forward on that

12  particular issue.

13      I mean, we realize the Court has limited time, so we want

14  to focus, you know, on the arguments and understanding what

15  Your Honor's going to rule as far as our ability to expand the

16  invalidity case and how we're going to deal with that.  It

17  would be more of an issue if they had to rely on their

18  preliminary infringement contentions.

19      THE COURT:  If I understand you correctly -- so having

20  heard now what -- everything -- I think I've heard everything

21  in the case, I'm going to give the defendant -- or defendants

22  two months to provide additional invalidity or art to the

23  plaintiff.  And you all can figure out what that does to your

24  schedule and hopefully you all can work those dates out.

25      I think with the trial date what it is, it should be

1   doable.  But if not, let me know.

2       But -- and by the way, I need to know as in, like, by the

3   end of the week because I can do stuff with you all's

4   schedule -- you all's trial schedule now.  I can't do much

5   about it in December.  So -- but if you all figure out that

6   decision impacts your trial date, let me know now and I can

7   move something up, can move something back, can do all that

8   stuff.

9       And so having made that decision, is there anything else

10  that -- Mr. Tyler, I'll start with you.

11      Is there anything else we need to take up?

12      MR. TYLER:  Thank you, Your Honor.  I believe that covers

13  the issues.  I do have some questions too for clarification.

14      On -- we have expert reports that are due under the

15  current schedule.  Are we able to push pause on those until we

16  have had the opportunity to -- I don't want to do two reports,

17  if that makes sense, on --

18      THE COURT:  I would pause doing your -- if what you're

19  saying is, the defendants are working on an invalidity report,

20  I don't know that it makes sense to do a report and then a

21  supplemental report.

22      No.  I would wait the two months and -- that's why I'm

23  saying, if you all can get -- if you can push back the deadline

24  for the report, if you can still get the expert depositions

25  taken, if you can still prepare for trial on the trial date,

1    let me know.  If you can't, then I can, you know, adjust the

2    trial probably by, you know, a couple weeks or a month at most,

3    if I do it now.

4        MR. TYLER:  I didn't mean to misspeak.  We've already

5    served our invalidity reports.  The first round of reports have

6    been in.  It's just the second round, rebuttal reports, I would

7    suggest that we would pause.

8        THE COURT:  You're not doing a rebuttal report on

9    invalidity?

10       MR. TYLER:  Right.  On noninfringement, right.  And we

11   have to deal with --

12       THE COURT:  We have -- you have the plaintiffs'

13   infringement report, which they're not asking to supplement.

14   I'm not sure why there's a problem with your responding to

15   their infringement report.

16       MR. TYLER:  Well, again, it's been a question -- an open

17   question and our experts didn't know whether to go forward and

18   deal with the new contentions or deal with the old contentions,

19   and so they've been working on the old contentions for awhile.

20       So I would ask --

21       THE COURT:  Let me make clear then.  They need to go with

22   the most current infringement contentions and the infringement

23   report and get their rebuttal report done with that.

24       MR. TYLER:  Can we have a couple of extra weeks then to

25   deal with that on the noninfringement side?

1    THE COURT:  I'm not sure -- Mr. Greene, when did you

2  provide this information to the defendant?

3    MR. GREENE:  We served it on July 6th, and then we served

4  the report on August 6th.

5    THE COURT:  And when is it due, Mr. Tyler, your rebuttal

6  report?

7    MR. GREENE:  September 3rd.

8    MR. TYLER:  About a week.

9    THE COURT:  I don't see any harm in a couple of extra

10  weeks.  I'll push back all rebuttal reports by two weeks.

11    MR. TYLER:  Thank you, Your Honor.

12    MR. GREENE:  And as far as our validity rebuttal, Your

13  Honor, report, that would also theoretically --

14    (Simultaneous speakers.)

15    THE COURT:  That's what I mean by "all rebuttal reports."

16    MR. GREENE:  But I guess, my question, though, Your Honor,

17  is:  Since they're going to be serving new contentions and I

18  guess a new validity report, should we hold off on serving a

19  rebuttal --

20    THE COURT:  I would not.  Do your rebuttal report, and

21  then if they provide an additional invalidity report -- and if

22  you want, go ahead and do your -- all the depositions because

23  all that can happen is the defendant can give you a

24  supplemental invalidity report and you can depose him then and

25  you can provide a rebuttal to that.

1      Anything else?

2      MR. TYLER:  I think that's it, Your Honor.

3      I did have one question on sort of practice point.  So

4  Your Honor didn't have -- he had -- you had the discovery chart

5  in front of you today, it seems like.  We weren't sure if the

6  motion to strike was in that or not, and the OGP talks about

7  the fact that motions to compel are part of it, but are motions

8  to strike part of the discovery dispute chart too?

9      THE COURT:  Mr. Tyler, I don't know why.  I'm just having

10  a hard time hearing you.

11      MR. TYLER:  Okay.  I'm sorry.  Can you hear me better now?

12      THE COURT:  Yes.

13      MR. TYLER:  Okay.  Sorry about that.

14      We -- the discovery chart that Your Honor had had our

15  discovery disputes on it.  The way that we read the OGP, a

16  motion to strike is not really part of the discovery process.

17  It's more of a -- well, the OGP says motions to compel.  And

18  so, you know, that's why the motion to strike was filed as a

19  separate matter not in the discovery chart.

20      So just going forward --

21      THE COURT:  No, no.  It -- no.  It just -- it was --

22  you're worrying about something -- it got screwed up on our

23  end.

24      MR. TYLER:  Okay.

25      THE COURT:  I mean, the problem was on our end.  Robby

1    just didn't think to include it in -- it's not an OGP -- it's

2    not a high-level deal, just it didn't get integrated.  So it's

3    not a problem.

4        I -- it just didn't get included, and I didn't look at it.

5    But it's -- it was on our side that everything didn't get

6    scooped up, and I'll make sure on our side in the future, you

7    know, we continue to -- you know, after three years, I'll make

8    sure that the clerks going forward know that if we're going to

9    take the time to get together on these issues, we can take up

10   everything at once.  So it's not a big deal.

11       MR. TYLER:  Thank you, Your Honor.

12       And before I say we're done, I want to make sure I let my

13   colleagues on the phone make sure that we're done, make sure

14   there's no other clarifications we need.

15       Terry or anybody else?

16       MR. WIKBERG:  I'm good.  Thank you.

17       MR. TYLER:  Thank you.

18       MR. WIKBERG:  To be clear, based on some of what was just

19   said here at the end, it appears to us that the January 10

20   trial date might be unrealistic.

21       THE COURT:  Well, you know, one of the great things about

22   this job is, that's really not something I need to stand around

23   and have you guys do hypotheticals on.  Get together, let me

24   know what you think.  If you -- if I know -- I'm almost certain

25   Mr. Greene would be opposed to pushing it back, just because

1    Mr. Greene's the plaintiff.  If he were the defendant, he would

2    be saying the same thing you are.

3        Y'all are the defendants, so you're going to tell me that

4    you want me to push it back.  That's what defendants do.  If I

5    would push it back to 2022, you guys would be even happier.

6        So talk with each other.  If you can't come to an

7    agreement, just get back to me quickly and tell me why you

8    think it needs to be pushed back.  Mr. Greene can tell me why

9    it doesn't.  All I care about is, I need to know sooner rather

10   than later because right now, if I need to, I can probably push

11   it back and not do too much damage and move something else

12   forward.

13       But you all get together and chat, and then let me know if

14   you have a disagreement.

15       Anything else from defendants?

16       MR. TYLER:  No, Your Honor.

17       THE COURT:  Mr. Greene?

18       MR. GREENE:  Nothing from us, Your Honor.  Thank you for

19   your time today.

20       THE COURT:  You bet.  Have a good day.

21       (Hearing adjourned at 2:50 p.m.)

22

23

24

25

1  UNITED STATES DISTRICT COURT  )

2  WESTERN DISTRICT OF TEXAS      )

3

4       I, Kristie M. Davis, Official Court Reporter for the

5  United States District Court, Western District of Texas, do

6  certify that the foregoing is a correct transcript from the

7  record of proceedings in the above-entitled matter.

8       I certify that the transcript fees and format comply with

9  those prescribed by the Court and Judicial Conference of the

10  United States.

11       Certified to by me this 28th day of August 2021.

12

13                              */s/ Kristie M. Davis*
                               KRISTIE M. DAVIS
                               Official Court Reporter
14                             800 Franklin Avenue
                               Waco, Texas 76701
15                             (254) 340-6114
                               kmdaviscsr@yahoo.com
16

17

18

19

20

21

22

23

24

25